UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY L.,[1] | ) |
| | ) |
| Plaintiff, | ) No. 17 cv 6608 |
| | ) |
| v. | ) Magistrate Judge Susan E. Cox |
| | ) |
| NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration, | ) ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Anthony L. ("Plaintiff") appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying him disability benefits under Title II of the Social Security Act. Plaintiff filed a Brief in Support of Reversing the Decision of the Commissioner of Social Security, which the Court construes as a motion for summary judgment, and the Commissioner filed a cross-motion for summary judgment. For the following reasons, Plaintiff's motion [dkt. 22] is granted, and the Commissioner's cross-motion [dkt. 29] is denied. The case is reversed and remanded for further proceedings consistent with this opinion.

**I.   Background**

    **a.   Procedural History**

On April 30, 2012, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability as of January 1, 2005. [Administrative Record ("R") 96.] Plaintiff's claim was denied initially and again at the reconsideration stage, after which Plaintiff timely requested an administrative hearing. [R 96, 108, 111-22.] On January 13, 2014, Administrative Law Judge ("ALJ") Sylke Merchan held a hearing, and on March 7, 2014, she issued a written decision denying Plaintiff's

---

[1] In accordance with Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name.

claim for disability benefits. [R 16-84.] On June 16, 2015, the Appeals Council denied Plaintiff's request for review, and ALJ Merchan's decision became the final decision of the Commissioner. [R 1-5]; *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

Plaintiff sought judicial review of this decision. [*See* R 636-40.] On April 18, 2016, the Commissioner filed an agreed motion for entry of an agreed judgment reversing its decision with remand for further administrative proceedings, which the District Court granted the same day. [R 641-44.] On May 23, 2016, the Appeals Council vacated ALJ Merchan's decision and remanded the case to an ALJ for further proceedings. [R 645-48.]

On February 24, 2017, a different ALJ, Jessica Inouye, held an administrative hearing. [R 1303-1405.] On May 17, 2017, ALJ Inouye issued a written decision denying Plaintiff's claim for disability benefits. [R 574-97.] Plaintiff did not file exceptions to ALJ Inouye's decision with the Appeals Council, making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(d). This action followed.

b. **Relevant Factual Background**

Plaintiff was born in February 1961 and was 43 years old as of his alleged disability onset date of January 1, 2005. [R 96.] Because Plaintiff's date last insured ("DLI") is December 31, 2009 [R 579], the relevant time period for Plaintiff's DIB claim is from January 2005 to December 2009 (the "Relevant Period"). *See McHenry v. Berryhill*, 911 F.3d 866, 869 (7th Cir. 2018). The Court, though, will discuss evidence outside the Relevant Period to the extent it helps to explain the issues before the Court.

In 1995, Plaintiff underwent brain surgery to remove a large craniopharyngioma.[2] [R 257.]

---

[2] A craniopharyngioma is a non-cancerous brain tumor that develops near the pituitary gland (which produces several important hormones) and the hypothalamus (which controls the pituitary gland's release of hormones). Genetic and Rare Diseases Info. Center, Craniopharyngioma, https://rarediseases.info.nih.gov/diseases/10486/craniopharyngioma (last visited Feb. 28, 2019).

2

Afterwards, Plaintiff developed panhypopituitarism,[3] for which he underwent hormone replacement therapy, and he gained a significant amount of weight. [R 257-58, 263-64, 267-68, 466, 1355.] By October 1997, he was obese, with a body mass index ("BMI") of 37.127. [R 265-66]; SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002) (categorizing BMIs between 35.0 and 39.9 as Level II obesity). Plaintiff was advised to regularly exercise, which he was not doing at the time. [R 265-66, 269.] Plaintiff was also noted as having obstructive sleep apnea, which complicated his obesity [R 265]; however, it was well controlled through his use of a CPAP machine. [R 264-65, 268-69.]

Plaintiff had issues with his lower extremities before his alleged disability onset date as well. While in high school, he underwent surgery to have the meniscus of his right knee removed. [R 350, 353, 465.] In March 2001, Plaintiff reported some swelling in his right knee and instances where this knee "caught" medially. [R 350.] Examination at this time showed "essentially normal motion and good stability," but "some crepitation and medial tenderness," and x-rays showed "pretty significant degenerative changes in the medical compartment[s]" of both knees. *Id.* And a few years after his brain surgery, Plaintiff developed "dependent discoloration in both lower extremities, particularly the lower legs," but more so on the right leg. [R 258.]

From approximately 1995 through 2005, Plaintiff co-owned and managed a restaurant. [R 50-51, 210-11, 1320, 1329-30.] Medical records note that as of October 1997, Plaintiff was spending 3-4 days per week at the restaurant, working 14-18 hours per day and being on his feet 10-13 hours. [R 265, 268.] According to Plaintiff, though, in his final years working at the restaurant, he gained a lot of weight (which affected his knees), had trouble sleeping and fatigued more quickly, and had more trouble walking. [R 211, 1358, 1374.] Due to his conditions, Plaintiff stopped working

---

[3] Panhypopituitarism is a generalized or particularly severe type of hypopituitarism, a condition where the "pituitary gland either fails to produce one or more of its hormones or doesn't produce enough of them." Dorland's Medical Dictionary, Panhypopituitarism, http://www.dorlands.com (last visited Feb. 28, 2019); Mayo Clinic, Hypopituitarism—Symptoms and causes, https://www.mayoclinic.org/diseases-conditions/hypopituitarism/symptoms-causes/syc-20351645 (last visited Feb. 28, 2019).

at the restaurant in 2005. [R 49-50, 179, 210, 1322-23.] He has not worked since. [R 50, 210.]

In March 2005, shortly after his alleged onset date, Plaintiff presented at the Mayo Clinic for evaluation and examination. [R 253-61, 354-55, 365.] Plaintiff first saw Dr. Charles Abboud, who noted that Plaintiff had degenerative joint disease in both knees and diagnosed Plaintiff with post-operative craniopharyngioma, panhypopituitarism on replacement therapy, obesity, obstructive sleep apnea on CPAP, and venous dependency in both lower extremities. [R 257, 260-61.] On examination, Plaintiff was noted to have "significant generalized obesity" and a BMI of 42.365, which constitutes extreme obesity. [R 259]; SSR 02-1p, at *2 ("'extreme' obesity…includes BMIs greater than or equal to 40"). Dr. Abboud also noted Plaintiff was "doing well" using his CPAP machine and that he was going to continue with the CPAP to manage his sleep apnea.[4] [R 260.] Plaintiff also reported he had recently "started to work out," and Dr. Abboud noted that Plaintiff had "embarked on an exercise program." [R 258, 260.] Plaintiff then presented to Dr. Paul Wennberg for evaluation of his lower extremities. [R 354-55.] Lower extremity venous studies revealed severe and moderate venous incompetence on the right leg and left leg, respectively. [R 355.] Plaintiff was diagnosed with bilateral venous insufficiency,[5] more so on the right side. [R 255, 355.] Lastly, Plaintiff presented to Dr. Haitham Abu-Lebdeh regarding his obesity. [R 253-55, 365.] Plaintiff's BMI was 41.069, and a review of his systems was significant for sleep apnea, fatigue, occasional snoring, lower extremity edema, and chronic symptoms. [R 253.] Dr. Abu-Lebdeh and Plaintiff discussed the importance of diet and exercise for successfully losing weight and maintaining weight loss, and they agreed Plaintiff would slowly initiate an exercise program, with a gradual increase to twice-per-day exercise. [R 254.]

---

[4] Plaintiff, however, testified that his CPAP machine did not help him all that much during the Relevant Period. [R 1377-78.]

[5] "Venous insufficiency is a condition where the veins have problems sending blood from the legs back to the heart." MedlinePlus Med. Encyclopedia, Venous insufficiency, https://medlineplus.gov/ency/article/000203.htm (last visited Feb. 28, 2019). The blood that should be sent to the heart ends up pooling and collecting in the veins of the legs. *Id.*; WebMD, What is Chronic Venous Insufficiency?, https://www.webmd.com/dvt/dvt-venous-insufficiency#1 (last visited Feb. 28, 2019).

Yet Plaintiff continued to struggle with obesity. In December 2006, almost two years after seeing Dr. Abu-Lebdeh, Plaintiff presented to Dr. Roy Weiss for an opinion on weight management. [R 559-60.] At this time, Plaintiff weighed 287 pounds, which meant his BMI was 45.7. [R 560.] Dr. Weiss noted that Plaintiff's obesity caused him difficulty walking, which, in turn, caused him to become more obese. *Id.* Dr. Weiss recommended that Plaintiff consider "intensive weight loss management programs," medication, or gastric bypass surgery. *Id.* But the ALJ pointed out, and Plaintiff does not dispute, that there is no indication Plaintiff followed any of these recommendations prior to the DLI. [R 583.] By November 2008, Plaintiff was still extremely obese. [*See* R 484, 486 (noting weight of just over 275 pounds and a 43.01 BMI).] Plaintiff was still at the same obesity level shortly before his DLI. [*See* R 474-75 (recording Plaintiff's weight as 276 pounds in December 2009).]

After visiting the Mayo Clinic, Plaintiff presented to Dr. Matthew Jimenez at the Illinois Bone and Joint Institute ("IBJI") in August 2005, complaining of bilateral knee pain and stiffness (although greater in his left knee than his right knee). [R 182-83, 347-48.] Dr. Jimenez noted that Plaintiff had bilateral knee osteoarthritis, with 1+ effusion bilaterally, positive crepitation, and medial joint line tenderness in both knees, although more prevalent on the left knee than the right knee. [R 347-48.] X-rays showed early degenerative changes in the medical compartments of the knees, left greater than right. [R 348.] Dr. Jimenez administered pain relief injections to both knees, explained that he would see Plaintiff back the next week for a series of additional pain relief injections, and noted that Plaintiff was "eager to move forward" with the injections. *Id.*

From September 2005 through April 2008, Dr. Jimenez administered approximately 30 bilateral knee injections. [R 270-79, 281-313, 316-27, 330-39, 341-46.] Typically, Plaintiff would have four injections over a three- to four-week span, and then return for another series of injections three to five months later. [*See id.*] During his first series of injections in September 2005, Plaintiff

5

reported having a "tremendous amount of pain relief" and less trouble arising from a chair, standing for prolonged periods of time, and walking great distances. [R 341, 343, 345.] Examinations at this time also noted no appreciable or significant knee joint effusion and less pain on extremes of motion. [R 342, 344, 346.] Although Plaintiff's knee pain would seemingly return over time, Dr. Jimenez repeatedly reported improvement once Plaintiff again began undergoing a series of knee injections. [*See, e.g.*, R 270-71, 273-74, 276-78, 281-84, 286-87, 289-90, 292-94, 296-97, 299-300, 302-14, 316-21, 323-26, 330-35, 337-38.] When administering Plaintiff's last series of injections in April 2008, Dr. Jimenez again reported that Plaintiff "had a good amount of pain relief" and "experienced less trouble arising from a chair, standing for prolonged periods of time, and walking great distances." [R 270.] Examinations at this time showed no appreciable knee joint effusion and less pain on extremes of motion. [R 271.] Plaintiff was supposed to see Dr. Jimenez again in three months, *id.*, but there is no indication in the record he did so.

In November 2008 and January 2009, Plaintiff presented to endocrinologist Dr. Amy Aronovitz. [R 479-88, 585.] On both occasions, Dr. Aronovitz noted that upon examination, Plaintiff had grossly intact sensation, full motor capacity in all extremities, and normal (2+) deep tendon reflexes in all extremities without delay. [R 481, 486.] In April 2009, Plaintiff presented to Dr. Proctor Anderson seeking treatment for knee pain. [R 353.] X-rays showed degenerative arthritis in both knees, although the more serious component was the medial compartment of the right knee. *Id.* Dr. Anderson recommended pain relief injections, and he administered three injections into Plaintiff's right knee over the next two weeks. [R 351-53.] Plaintiff saw Dr. Aronovitz again in December 2009, shortly before his DLI. [R 474-79.] As she had during Plaintiff's previous two visits, Dr. Aronovitz noted that Plaintiff had grossly intact sensation, full motor capacity in all extremities, and normal (2+) deep tendon reflexes in all extremities without delay. [R 476.]

As to Plaintiff's testimony about how his various ailments affected his daily activities,

6

Plaintiff testified that he would spend six to seven hours per day lying down in his bedroom. [R 1369.] He also testified that when he sat for any length of time, his knees would hurt, and his knees and his legs would cramp up. [R 1365.] According to Plaintiff and his wife, he could not sit for longer than 10 to 30 minutes; after that, he had to get up to walk around for about 15 minutes to help relieve the pain. [R 59, 187, 195, 205, 1365, 1367-68, 1377.] Plaintiff further testified that his lower leg would swell and become discolored when sitting or standing, and that he would lie down and raise his leg at night to ease the swelling. [R 60-61, 1358-59.] Despite these problems, Plaintiff was able to fly to and from Italy in mid-2010. [*See* R 460, 586.]

Plaintiff also testified about Dr. Jimenez's knee injections. He testified that although the "injections would help mostly right when [he] was getting them," they "wore off faster and faster each time [he] had [the] procedure done." [R 56-57, 1366.] Plaintiff also claimed that the injections eventually became unnecessary, as they were not really helping him at all. [R 56, 1360.] In the end, Plaintiff was getting the injections "for no reason at all," so he stopped in approximately 2009. [R 1361.]

Plaintiff's daily activities consisted of watching television, going on the computer (to online trade or shop, for example), taking naps, and reading. [R 198-99, 1332-34, 1378-79.] He did not run errands, make dinner, or otherwise have significant responsibilities in the home. [R 197-98, 1378-79.] Plaintiff also contended that his ability to dress and bathe himself was limited and that he was unable to perform household chores or yardwork because of his weight issues and pain. [R 196-98.] Exercise for Plaintiff amounted to swimming for short periods of time while holding onto a wall, as "everything else would be too much pressure on [his] legs." [R 47, 1379-80.] As for side effects from medication, Plaintiff alleged that his medications caused weight gain, sleep problems, irritability, mood swings, constipation, bloating in his lower extremities, and shortness of breath. [R 202, 1355-56.]

Regarding cane use, Plaintiff testified at the first hearing that he was prescribed a cane,

although he "wasn't using a cane so much" during the Relevant Period. [R 61.] At the second hearing, though, Plaintiff testified that during the Relevant Period, he used a cane "[q]uite often." [R 1372.] This meant daily use when Plaintiff went out. [R 1373.]

  **c. The January 2014 Hearing, ALJ Merchan's Decision, and the Remand Orders**

Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified at the January 2014 hearing before ALJ Merchan. [R 36-38, 42-82.] At the hearing, the ALJ asked the VE about the availability of jobs for a hypothetical individual who could work at the sedentary exertional level with some postural restrictions. [R 70-71.] The VE testified that such an individual could work as a telephone solicitor, credit checker, surveillance system monitor, and bench hand assembler. [R 71-72.] The ALJ then asked the VE about an individual who also needed "a sit/stand option on an hourly basis," and the VE responded that someone who needed such a sit/stand option would be able to perform the jobs he had previously identified. [R 72.] The ALJ did not ask the VE about the availability of jobs for an individual who needed any other type of sit/stand option. [R 69-82.]

In denying Plaintiff's DIB claim, ALJ Merchan found that, through his DLI, Plaintiff had the residual functional capacity ("RFC")[6] to perform sedentary work with the following exceptions: he should avoid climbing ladders, ropes, and scaffolds; he could only occasionally stoop, bend, kneel, crouch, crawl, and climb ramps and stairs; and he required the flexibility to alternate between sitting and standing at will. [R 23.] Based on this RFC and the testimony of the VE at the hearing, the ALJ found that Plaintiff could have performed jobs that existed in significant numbers in the national economy, such as credit checker, surveillance system monitor, or bench hand assembler. [R 29-30.] Thus, Plaintiff was not disabled. [R 30.]

After Plaintiff filed suit challenging ALJ Merchan's decision, the Commissioner filed an agreed motion seeking entry of an agreed judgment reversing the decision pursuant to the fourth

---

[6] An individual's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a).

sentence of 42 U.S.C. § 405(g) with remand for further administrative proceedings. [R 636-39, 643-44.] The District Court granted the motion ("the District Court Remand Order"). [R 641-42.] Adopting language from the parties' agreed motion, the District Court Remand Order ordered that:

> Upon remand, the claim will be sent to an administrative law judge (ALJ), who will be instructed to further develop the record and obtain supplemental vocational expert testimony on the question of whether or not jobs exist in significant numbers for a claimant with plaintiff's residual functional capacity, including the need for an option to sit and stand at will. Plaintiff will be given the opportunity to make arguments. The ALJ will issue a *de novo* decision.

[R 642; *compare with* R 643-44, ¶ 2.]

The Appeals Council, in turn, vacated ALJ Merchan's decision and remanded the case to an ALJ ("the Appeals Council Remand Order"). [R 647-48.] The Appeals Council Remand Order identified the following issue to be addressed on remand:

> The finding in the hearing decision that the claimant can perform other work existing in the national economy is not supported by substantial evidence. The Administrative Law Judge found the claimant had the residual functional capacity of a reduced range of sedentary work, including the need for the flexibility to alternate between sitting and standing at will. However, an audit of the hearing reveals the Administrative Law Judge posed hypotheticals that were inconsistent [with] the residual functional capacity in the hearing decision. Although the Administrative Law Judge indicated the claimant required the flexibility to alternate between [sitting and] standing at will, the Administrative Law Judge only included an hourly sit/stand option in the hypotheticals posed to the vocational expert. Thus, the vocational expert never considered an at-will sit/stand option, and additional vocational expert evidence is necessary.

[R 647 (internal record citations omitted).] The Appeals Council Remand Order instructed the ALJ on remand to:

> Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base, including the claimant's ability to sit/stand at will. The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy.

[R 647-48 (internal citations omitted).] The Appeals Council also instructed the ALJ to "take any further action needed to complete the administrative record and issue a new decision." [R 648.]

9

### d. The February 2017 Hearing and ALJ Inouye's Decision

On remand, ALJ Inouye held a hearing in February 2017. [R 1303-1405.] Plaintiff, represented by counsel, and a VE testified. [R 1303-05, 1317-1403.] The ALJ asked the VE a number of hypothetical questions, but she failed to ask the VE about an individual who could sit and stand at will. [R 1385-93.] Plaintiff's counsel did though, and the VE testified that an individual who was permitted to sit and stand at will even one day per week would be unemployable. [R 1393-96; Dkt. 22, p. 6.]

ALJ Inouye subsequently issued a written decision denying Plaintiff's DIB claim. [R 574-97.] At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the Relevant Period (his alleged disability onset date, January 1, 2005, through his DLI, December 31, 2009). [R 579-80.] At Step Two, the ALJ found that Plaintiff had the following severe impairments before his DLI: post-operative craniopharyngioma in 1995 without recurrence but with panhypopituitarism, on replacement therapy; obesity; obstructive sleep apnea; venous insufficiency in bilateral lower extremities; and bilateral knee osteoarthritis. [R 580.] At Step Three, ALJ Inouye determined that, through his DLI, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

Before Step Four, ALJ Inouye found that during the Relevant Period, Plaintiff had the RFC to perform sedentary work except that he could stand/walk two out of eight hours and sit six out of eight hours; he could not climb ladders, ropes, or scaffolds; and he could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. [R 581.] Notably, ALJ Inouye disagreed with ALJ Merchan's previous finding that Plaintiff's RFC required an at-will sit/stand option, and she determined, based on her own review of the evidentiary record, that there was no medical necessity for such a sit/stand option during the Relevant Period. [R 581, 586.] At Step Four, ALJ Inouye found

that Plaintiff could not have performed any past relevant work during the Relevant Period. [R 589.] At Step Five, though, ALJ Inouye found that Plaintiff could have performed other jobs that existed in significant numbers in the national economy through his DLI, such as receptionist, cashier, and order taker. [R 589-90.] The ALJ based this finding on Plaintiff's RFC and the VE's testimony. *Id.* Because of her Step Five determination, the ALJ found that Plaintiff was not disabled at any time during the Relevant Period. [R 590.]

## II. Social Security Regulations and Standard of Review

To be eligible for DIB, an applicant must prove that he is disabled under the Social Security Act as of his DLI. *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). ALJs conduct a sequential five-step inquiry to determine whether a claimant is legally disabled, asking (1) Is the claimant unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (internal quotations omitted); *Young*, 957 F.2d at 389. The claimant bears the burden of proof at steps one through four. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). At the final step, the burden shifts to the Commissioner; if she shows that the claimant can "perform work that exists in a significant quantity in the national economy," the claimant is not disabled. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

In disability benefits cases, the scope of a court's review is limited to determining whether the Commissioner's final decision adequately discusses the issues and is based upon substantial evidence

and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Clifford*, 227 F.3d at 869. Although the Court's review is deferential, *Steele v. Barnhart*, 290 F.3d 936, 938 (7th Cir. 2002), the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and her conclusions. *Id.* at 941 (internal citation and quotations omitted).

**III. Discussion**

Plaintiff contends that ALJ Inouye reversibly erred by: (1) violating the Appeals Council Remand Order; (2) failing to set forth a supported rationale for her RFC determination; and (3) not assessing Plaintiff's subjective symptom allegations in accordance with SSR 16-3p.[7] For the reasons discussed more fully below, the Court rejects Plaintiff's first argument, but agrees with the second two, and thus reverses and remands this matter.

    **a.    ALJ Inouye Did Not Violate the Appeals Council Remand Order**

When a case is remanded, an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). Plaintiff contends that ALJ Inouye failed to comply with the Appeals Council Remand Order by assessing an RFC that did not require a sit/stand option (like ALJ Merchan's RFC) and failing to question the VE about a sit/stand option. Plaintiff further contends that these errors

---

[7] SSR 16-3p supersedes SSR 96-7p and its focus on "credibility," clarifying "that subjective symptom evaluation is not an examination of the individual's character." *See* SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016). Because SSR 16-3p applies to ALJ determinations made "on or after March 28, 2016," it applied to the ALJ's decision here, which issued in May 2017. [R 591]; Notice of Social Security Ruling, 82 Fed. Reg. 49462-03, 2017 WL 4790249, at n.27 (Oct. 25, 2017).

12

require remand. The Court disagrees on both fronts.

The Appeals Council Remand Order did not prohibit ALJ Inouye from reevaluating Plaintiff's RFC nor did it require her to adopt an RFC that included a sit/stand option. Quite the opposite: by expressly vacating ALJ Merchan's decision [R 647], the order nullified her findings, including the RFC assessment. *See Leigh v. Engle*, 669 F. Supp. 1390, 1393 (N.D. Ill. 1987) (explaining that vacated factual findings have "no continued vitality" except insofar as another court may have adopted the findings and made them its own); *Vacate*, Black's Law Dictionary 1688 (9th ed. 2009) ("To nullify or cancel; make void; invalidate"). Indeed, even without an express vacatur, an ALJ is generally "free to reevaluate the facts" on remand. *Houston v. Sullivan*, 895 F.2d 1012, 1015 (5th Cir. 1989); *see also Penrod ex rel. Penrod v. Berryhill*, 900 F.3d 474, 477 (7th Cir. 2018) (noting that the court had found no authority requiring "an ALJ to use the same RFC that a different ALJ used in denying benefits for a prior period"). Thus, in crafting an RFC on remand, ALJ Inouye was working on a blank slate.

That ALJ Inouye was not obligated to defer to ALJ Merchan's RFC determination is further supported by the District Court Remand Order, which instructed the ALJ on remand to issue a *de novo* decision. [R 642.] A *de novo* decision is an independent determination made without deference to prior findings. *See Stein's Inc. v. Blumenthal*, 649 F.2d 463, 467 n.6 (7th Cir. 1980) ("It is sometimes said that '*de novo*' means an independent determination by the court in which no deference is given or may be given to any prior determination of the controversy."); *Tekena USA, LLC v. Fisher*, 2006 WL 2536631, at *4 (N.D. Ill. Aug. 31, 2006) ("*De novo* review requires us to make an independent examination of the bankruptcy court's judgment without giving deference to that court's analysis or conclusions."); *Hearing de novo*, Black's Law Dictionary 789 (9th ed. 2009) ("A reviewing court's decision of a matter anew, giving no deference to a lower court's findings….A new hearing of a matter, conducted as if the original hearing had not taken place."). ALJ Inouye made

such a decision: she independently determined Plaintiff's RFC without deferring to ALJ Merchan's RFC determination. [R 581, 586.]

To be sure, the Appeals Council Remand Order also instructed ALJ Inouye to obtain supplemental evidence from a VE to clarify the effect of Plaintiff's "ability to sit/stand at will." [R 647.] But although this instruction indicates that the Appeals Council contemplated that the RFC on remand would contain such a restriction, the Court does not read it as *requiring* the ALJ to incorporate an at-will sit/stand restriction, especially given the Appeals Council's vacatur of ALJ Merchan's RFC and the District Court's order for a *de novo* decision. Indeed, there is no indication that either the Appeals Council or the District Court evaluated whether ALJ Merchan's at-will sit/stand option was supported by substantial evidence. As the Appeals Council explained, the error necessitating remand was ALJ Merchan's failure to question the VE about someone who could sit and stand at will when her RFC assessment allowed for this option. [R 647]; *see Tooley v. Astrue*, 2013 WL 2449912, at *10 (N.D. Ill. June 4, 2013) ("[A] valid hypothetical question must ordinarily include limitations that an ALJ finds for a claimant's RFC.") (internal quotations omitted). In light of this error, it made sense for the Appeals Council to specifically instruct the ALJ to ask hypothetical questions about an at-will sit/stand option.

Furthermore, if the Appeals Council had wanted the ALJ on remand to refrain from reassessing Plaintiff's need for a sit/stand option, it could have explicitly ordered the ALJ to adopt ALJ Merchan's RFC determination while ordering further proceedings on other issues. *See* 20 C.F.R. § 404.977(b) ("The administrative law judge shall take any action that is ordered by the Appeals Council[.]"). Instead, the Appeals Council vacated ALJ Merchan's decision. [R 647.] Similarly, if Plaintiff and the Commissioner wanted the ALJ on remand to adopt ALJ Merchan's RFC determination, they should have asked the District Court to affirm that portion of the decision when they moved to remand the case. *See, e.g.*, *Bosnich v. Barnhart*, 2006 WL 2265529, at *1, *4-7 (N.D.

14

Ill. July 31, 2006) (affirming the ALJ's decision in part and reversing and remanding as to other grounds). The parties went a different direction, requesting the District Court to order the ALJ to issue a *de novo* decision. [R 643-44.]

Thus, the Appeals Council Remand Order did not prohibit ALJ Inouye from reevaluating Plaintiff's RFC. Nor did it require her to assign Plaintiff an RFC that included a sit/stand option. At the same time, the plain text of the order required ALJ Inouye to "[o]btain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base, *including the claimant's ability to sit/stand at will*." [R 647 (emphasis added).] ALJ Inouye, though, failed to ask the VE any hypothetical questions about an individual who would need to sit and stand at will. [R 1385-93.] Nonetheless, in response to questioning from Plaintiff's counsel, the VE testified that an individual who was permitted to sit and stand at will even one day per week would be unemployable. [R 1393-96; Dkt. 22, p. 6.] So despite her failure to ask any questions on the at-will sit/stand issue, ALJ Inouye did obtain the "supplemental evidence" required by the Appeals Council Remand Order. And even if ALJ Inouye erred in not asking the questions herself, the error was harmless, as the evidence required by the Appeals Council Remand Order was still obtained and in the record. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error is harmless and does not require remand where the reviewing court is "convinced that the ALJ will reach the same result" on remand).

In sum, ALJ Inouye did not fail to comply with the Appeals Council Remand Order and, even if she did, this failure was harmless. Remand is not required on this issue.

    **b.**    **The ALJ's Subjective Symptom Evaluation Failed to Build an Accurate and Logical Bridge Between the Evidence and the ALJ's Conclusion.**

An ALJ's evaluation of a claimant's symptom allegations is entitled to special deference, and it will be overturned only if it is "patently wrong," *i.e.*, when it "lacks any explanation or support." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th

Cir. 2008). Put another way, the Court will uphold a subjective symptom evaluation so long as it includes "specific reasons supported by the record" that "build an accurate and logical bridge between the evidence" and the ALJ's conclusion. *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000) (internal quotations omitted).

ALJ Inouye got off to a bad start when she stated that Plaintiff's "testimony and allegations of pain, symptoms, and limitations" greater than those accommodated by her RFC were "not supported fully in the medical record." [R 585.] Although the Court does not view this statement as reflecting the application of an improper evidentiary standard, as Plaintiff contends, reviewing courts have criticized the use of similar boilerplate language by ALJs to characterize their subjective symptom evaluations. *See, e.g.*, *Pepper*, 712 F.3d at 367 (ALJ found that the claimant's allegations were "not credible to the extent they are inconsistent" with the RFC); *Phillips v. Berryhill*, 2018 WL 4404665, at *6 (N.D. Ill. Sept. 17, 2018) (ALJ found that the claimant's allegations were "not entirely consistent" with the evidence). The ALJ's use of this language here, though, is harmless; as will be discussed, the ALJ otherwise supported her subjective symptom evaluation with legitimate reasons grounded in the record. *See Schomas v. Colvin*, 732 F.3d 702, 708-09 (7th Cir. 2013); *Pepper*, 712 F.3d at 367-68.

The ALJ's subjective symptom evaluation has other shortcomings as well. The ALJ found that Plaintiff's alleged need to use a cane was undermined by, among other things, the lack of a prescription for a cane during the Relevant Period and Plaintiff's ability to swim and work out. [R 582, 587.] But "[a] cane does not require a prescription," *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), so the lack of a prescription does not show that Plaintiff did not use a cane. Nor does the fact that Plaintiff swam or worked out. A person does not hold a cane while swimming, especially if he holds onto a wall to swim, as Plaintiff did. [R 1380.] And "working out" can encompass a wide range of activities with varying exertion levels, many of which could be performed by someone who uses a

16

cane. For example, the need for a cane would not necessarily prevent someone from riding a stationary bike or using an elliptical machine. Without delving deeper into what constituted "working out" for Plaintiff, the ALJ should not have used it to discount his alleged need to use a cane. Also, the ALJ did not discuss Plaintiff's limited daily activities, which is a relevant factor in evaluating a claimant's subjective symptom allegations. *See Kittelson v. Astrue*, 362 F. App'x 553, 557-58 (7th Cir. 2010); SSR 16-3p, at *7.

Much of the ALJ's purported reasons for discrediting the Plaintiff's subjective complaints failed to build an accurate and logical bridge to the conclusion those reasons claimed to support. For instance, the ALJ found "disingenuous" Plaintiff's hearing testimony that the knee injections he received were ineffective because, in her view, other evidence indicated that the injections were, in fact, effective. [R 586-87.] However, the Plaintiff's testimony was not that the injections were ineffective; his testimony was that the injections began to have reduced effectiveness over time, which ultimately led to Plaintiff no longer seeking that treatment. [R. 1361 ("It would help the right knee…but, the more I kept getting them, the shorter time it lasted….")] From reading the ALJ's opinion, it would appear as if the Plaintiff completely denied the efficacy of knee injections, but the transcript demonstrates otherwise. Furthermore, the administrative record supports the Plaintiff's contention he was no longer getting lasting relief from the injections in 2009 and stopped receiving them. Because the ALJ mischaracterized the Plaintiff's testimony and relied on a flawed reading of that testimony, the Court cannot say that the ALJ built and accurate and logical bridge between the evidence and her conclusion.

The ALJ also noted that Plaintiff flew to Italy only six months after the DLI.[8] Although, flying to Italy is inconsistent with a claimed inability to travel more than short distances, it does not

---

[8] The record indicates this trip was more like seven months after the DLI [see R 460], but Plaintiff does not contend that this inconsistency affects the supportability of the ALJ's reasoning.

17

necessarily translate to an ability to work on a full-time basis in a job that requires prolonged sitting five days per week or more. The Seventh Circuit has regularly warned Courts and ALJs against equating the ability to do chores and other activities of daily living with the ability to maintain full-time employment. *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). The Court believes this principle also applies to the instant matter, in that the ability to endure one day of prolonged sitting does not, without more, demonstrate that Plaintiff can tolerate prolonged sitting on a full-time basis. *See Hamilton v. Colvin*, 525 Fed. Appx. 433, 438 (7th Cir. 2013) (ALJ did not explain how "isolated recreational event" of driving to Kentucky demonstrated that Plaintiff could sit on a full-time basis, thereby failing to build a logical bridge between evidence and conclusion). The ALJ did not probe whether Plaintiff had to stand regularly during the flight, how long he sat for prolonged stretches, or whether he had any lingering pain or swelling following the flight. *See id.* The Court does not believe the ALJ did the necessary legwork to build an accurate and logical bridge between the evidence she relied on to support her opinion (*i.e.*, that Plaintiff flew to Italy once), and her conclusion (*i.e.*, that Plaintiff was capable of performing full-time sedentary work).

In short, the ALJ's examination of Plaintiff's subjective symptoms fails to build an accurate and logical bridge to her conclusions, and the Court reverses on this basis.

    **c.**     **The ALJ Erred in Assessing Plaintiff's RFC**

The ALJ relied on Plaintiff's online trading activities as proof of Plaintiff's ability to perform full-time sedentary work. It seems clear from the ALJ's opinion that she focused on Plaintiff's online trading and reading because she believed Plaintiff's performance of these activities while sitting was inconsistent with his complained-of sitting limitations. What seems less clear is whether Plaintiff performed these activities while sitting, or how long he had to sit to do them. At the hearing, Plaintiff testified that he would simply perform stock transactions based on information he had gleaned while watching television. [R. 1333.] He specifically disclaimed spending "hours researching" the stocks

18

he was trading. [R. 1334.] From the Court's review of the record, it appears Plaintiff would spend a few minutes on the computer occasionally trading stocks based on information he received from television. The Court is not sure if he watched television sitting up or laying down, and neither was the ALJ. The Court is not sure if the trades were performed sitting at a desktop computer or laying down with a laptop, and neither was the ALJ. The Court is simply not sure how the Plaintiff's trading activities, as described in this record, could fairly have any bearing on his ability to perform sedentary work or sit for long periods of time, when the entirety of the activity explored in the record could have been easily performed in a recumbent position. As such, the ALJ's reliance on that activity to form her RFC determination was error, and requires reversal.

**IV. Conclusion**

For the foregoing reasons, Plaintiff's motion [dkt. 22] is granted, and the Commissioner's cross-motion [dkt. 29] is denied. The case is reversed and remanded for further proceedings consistent with this opinion.

Entered: 3/26/2019

Susan E. Cox,
United States Magistrate Judge